**J. S. GISSEL & CO. et al.**
v.
**DIXIE CARRIERS, Inc.**
**THE BEN B.**

**AMERICAN BARGE LINE CO.**
v.
**THE SAN JACINTO et al.**

**No. 2058 and 2086 Admiralty.**

United States District Court,
E. D. Louisiana,
New Orleans Division.

Jan. 11, 1954.

Terriberry, Young, Rault & Carroll, Alfred M. Farrell, Jr., New Orleans, La., for J. S. Gissel & Company, the Tug San Jacinto and Shell Oil Co.

Phelps, Dunbar, Marks & Claverie, Charles Dunbar, III, New Orleans, La., for American Barge Line Co.

Lemle & Kelleher, Selim B. Lemle, New Orleans, La., for Dixie Carriers, Inc., and the Tug Ben B.

WRIGHT, District Judge.

At about noon on June 20, 1951 in the Gulf Intracoastal Canal, the Tug Ben B, proceeding west with a hawser tow of five empty barges, was in collision with the face barge of the Tug San Jacinto, proceeding east with a pusher tow of three loaded oil tank barges. The responsibility for this collision gives rise to this case.

The San Jacinto is a single screw Diesel Tug 64.9 feet in length, 18.6 feet in beam with a draft of 8 feet. Overall her tow of three barges ahead was 519 feet in length, 39 feet in beam, with a draft of 8.6 feet. The Ben B is a single screw Diesel Tug 81.6 feet in length 23.3 feet in beam and 9.6 feet in depth. Overall her tow astern was about 900 feet in length by 35 feet in beam with a draft of about 2 feet and a freeboard of 8 feet. The five empty barges were made up in a single line coupled with 9 inch hawser. There was about 1½ feet horizontal clearance between the stern of the Ben B and the overhanging rake of the first barge.

The collision occurred in a sharp blind bend of the waterway near Milepost 84. For approximately one mile west of the bend the waterway is straight. For three miles east of the bend the waterway is so tortuous that that section of it has become known as the "wiggles". The navigable width of the waterway at the site of the collision was 125 feet and the current of two to three knots was running from west to east. Visibility was excellent.

The story of the collision begins with the San Jacinto and her tow at Milepost 85 proceeding east and the Ben B and her tow in the vicinity of Milepost 82 proceeding west. At the time Captain Cupps was piloting the San Jacinto and the Mate Sansom was piloting the Ben B. On relieving the captain of the Ben B some minutes before the collision, Sansom was advised that the San Jacinto was somewhere around the bend at Milepost 84. In spite of that fact and the further fact that the Ben B's tow was at that time navigating the "wiggles", Sansom determined to pass a 700 foot log tow which was headed west in the canal. He gave no passing signal of any kind, and the log tow was not aware of the presence of the Ben B until the Ben B came alongside the two tugs which were towing the log tow by hawser. The small motorboat, Miss Tupelo, was lashed to the port side of the outboard tug.

While passing the log tow, Sansom called the San Jacinto by radio and asked the San Jacinto to slow down so that the Ben B and San Jacinto could pass in the straightaway west of the bend. Cupps on the San Jacinto, which at that time was at Milepost 85, agreed and cut his speed to slow, which, with the favoring current, amounted to three and one-half to four knots over the bottom.

When the San Jacinto completed the straightaway, the Ben B had not appeared around the bend. In spite of this fact the San Jacinto entered the bend, not having blown and not blowing a bend

signal of any kind. When the San Jacinto had almost cleared the bend, Cupps saw the Ben B with its tow approaching approximately 1,000 feet distant. One blast passing signals were exchanged and the engines of the San Jacinto were put at full speed ahead in order to complete the bend and bring the San Jacinto over to her starboard side of the canal to make way for the Ben B. In navigating the bend, which required a right turn for the San Jacinto, the San Jacinto, pushing her 519 foot tow, necessarily flanked over into the port side of the canal and the following current of two or three knots accentuated this flanking movement.

Meanwhile the Ben B, whose tow was still overtaking the log tow at the time passing signals were exchanged, continued at full speed ahead, approximately five knots over the bottom against the current, and angled for her starboard bank in order to make way for the San Jacinto. She was then brought so close to the starboard bank that her first barge took suction from the bank. In order to break the suction, Sansom on the Ben B put his wheel to port, with the result that when suction was broken, the Ben B sheered to port and rammed the face barge of the San Jacinto which was at that time in the middle of the canal. At the same time the last barge of the Ben B tow crushed the Miss Tupelo.

The San Jacinto maintains that the Ben B was at fault for making an agreement to meet the San Jacinto in the straightaway west of the bend, which agreement she did not and could not keep; that the Ben B gave no overtaking signals to the log tow and that this statutory fault contributed to the collision; and that the Ben B navigated her tow so close to the bank that her leading barge took suction, with the result that the Ben B went out of control in breaking the suction.

The Ben B claims fault on the part of the San Jacinto in failing to hold back around the bend after agreeing so to do, and in proceeding into the bend without first blowing a bend signal. She claims further that if there was error in the navigation of the Ben B, it was error in extremis caused by a dangerous situation not of her making.

 The court finds both vessels at fault. As to the Ben B, it is clear that her mate Sansom in his radio contact with the San Jacinto proposed to pass in the straightaway around the bend knowing that agreement could not well be kept by the San Jacinto. He knew at the time he made his proposal that the San Jacinto was less than one mile from the bend with a two to three knot favoring current. He knew he had the same current against him and that he was actually farther from the bend than was the San Jacinto. He knew, or should have known, that even if the Ben B ran full speed ahead, the San Jacinto would reach the bend first, unless she actually backed her engines and held up west of the bend. Running full speed with a 900 foot tow through the "wiggles" while passing a 700 foot log tow is not the act of a prudent seaman. Nor would backing a pusher tow with a single screw tug against the current in a narrow channel be.

Actually, at the time Sansom proposed the passage with the San Jacinto in the straightaway, he was already in trouble. He was then passing the long log tow with the long tow of the Ben B, and he had visions of the San Jacinto coming around the bend before he was able to bring his tow back over to the starboard side of the canal. In other words, Sansom was not afraid of passing the San Jacinto in the "wiggles". What he was afraid of was being forced to pass the San Jacinto while the Ben B was still passing the log tow, a physical, if not mathematical, impossibility in the narrow canal. So the in extremis situation which eventuated with the San Jacinto was to some extent at least of his own making.

 It is admitted that the Ben B committed the statutory fault of failing to sound an overtaking signal before undertaking to pass the log tow. 33 C.F.R. 311.18, Rule VIII. The evidence

further shows that the San Jacinto was seen by the log tow before the log tow personnel were aware that their tow was being overtaken by the Ben B. It is reasonable to assume that had the log tow known that it was being overtaken by the Ben B at the time the San Jacinto was first sighted, the log tow would have sounded the danger signal to advise the Ben B of the presence of the danger created by the approach of the San Jacinto. Whether such warning would have enabled the Ben B or the San Jacinto, whose personnel were not even aware of the presence of the log tow, to take such action as would avoid the collision is not clear. Suffice it to say that it has not been demonstrated that the sounding of the overtaking signal by the Ben B could not have averted the collision. Such being the case, the Ben B must be found at fault for not sounding the overtaking signal. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L. Ed. 148.

The Ben B was also at fault in navigating so close to the bank that her lead barge took suction. It is true that Sansom starboarded his helm in extremis in an effort to whip his tow around the log tow and out of the way of the oncoming San Jacinto. But, as has been shown, the in extremis was partly of his own making and therefore the Ben B cannot be excused.

As to the San Jacinto, the fault is also clear. Admittedly, the San Jacinto made an agreement by radio with the Ben B to pass the Ben B in the straightaway west of the bend, and admittedly, that agreement was not kept by the San Jacinto. If the San Jacinto had found it impossible or inadvisable to hold back west of the bend and wait for the Ben B to clear the bend, that fact should have been communicated in some way to the Ben B. Instead, in violation of her agreement, the San Jacinto proceeded into the bend without even taking the required precaution of sounding a bend signal. 33 C.F.R. 311.18, Rule V. Since this, too, is a statutory fault, and since, obviously, the San Jacinto has been

unable to show that her failure to sound the bend signal could not have contributed to the collision, the San Jacinto must be held at fault. The Pennsylvania, supra.

Decree accordingly.