**SLADE, INC., Successor to Higman Towing Company, Appellant,**

v.

**MISSISSIPPI VALLEY BARGE LINE COMPANY and Dixie Carriers, Inc., Appellees.**

**No. 18347.**

United States Court of Appeals
Fifth Circuit.

Nov. 3, 1961.

Rehearing Denied Jan. 11, 1962.

George E. Duncan, Wells, Duncan & Beard, Beaumont, Tex., for appellant.

George W. Brown, Jr., Beaumont, Tex., Thomas A. Brown, Jr., Houston, Tex., Geo. B. Matthews, New Orleans, La., John L. Fulbright, Beaumont, Tex., for appellees. Lemle & Kelleher, New Orleans, La., Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., Brown & Fulbright, Beaumont, Tex., of counsel.

Before CAMERON, BROWN and WISDOM, Circuit Judges.

CAMERON, Circuit Judge.

Appellant Slade, Inc.[1] appeals from an interlocutory decree by the court below holding the Tug Moir and Slade, Inc., its owner, solely at fault for a collision occurring between the tow of the Tug Moir and the tow of the Tug George

1. It became the owner of the Tug Moir, as successor to Higman Towing Company, after the issues in this action had been framed and undertook the defense

Peterkin. The action was commenced by appellee Mississippi Valley Barge Line Company, which filed a libel *in rem* and *in personam* against the Tug Moir and appellant to recover damages inflicted upon its barge M/V 717 in said collision. In order to prevent the arrest of the Tug Moir, appellant filed a claim, a combined stipulation for costs and for value, and also filed an answer to the libel, together with an impleading petition against the Tug George Peterkin and its owner, Dixie Carriers, Inc. The trial court entered its interlocutory decree, based upon detailed findings of fact, adjudicating that the damage to the barge was due solely to the fault of the Tug Moir, and not to any fault of the Tug George Peterkin and her tow. This appeal tests the correctness of the decree and the findings of fact upon

which it was based, the appellant charging that the findings were clearly erroneous in concluding that the Tug Moir was solely at fault and that the Peterkin did not have the last clear chance to avoid the collision.[2]

We do not agree that the findings of the trial court were clearly erroneous, McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20. From the pleadings, the testimony, the charts and exhibits and admissions in the briefs of the parties, the court below was justified in finding the facts set out below. Indeed, most of the controlling facts are admitted by appellant either in the pleadings or the briefs.

In the mid-afternoon of December 22, 1957, the Tug Peterkin was proceeding in an easterly direction in the Gulf Intra-

of the cause as claimant-respondent. Slade, Inc. will be hereinafter referred to as libelant or appellant.

2. The determinant facts found by the court below are these:

"On the afternoon of December 22, 1957, at approximately 4:00 P.M., a collision occurred between the tow of the Tug George Peterkin and the tow of the Tug Moir in the Intracoastal Waterway at approximately Mile 319, west of Harvey, Louisiana, the point of the collision being approximately one-half mile east of the Mud Bayou Bridge, located near High Island, Texas.

"The * * * Peterkin was on a voyage from Houston, Texas, bound for New Orleans, Louisiana, towing five barges astern, tandem style, using a towing hawser shackled into a bridle secured to the bow of her lead barge, * * *

" * * * the Tug Moir, pushing Barges H.T.C.O. No. 45 and H.T.C.O. No. 41, in that order, were west bound from South Jennings, Louisiana to Texas City, Texas.

"The Tug Moir was made up astern of Barge N.T.C.O. No. 45 by means of three sets of pushing cables and the bow of Barge H.T.C.O. No. 45 and the stern of H.T.C.O. No. 41 were made up stiff and tight by means of cross lines, couplings and ratchets. The entire two was made up as one flotilla.

"The pilot of the * * * Peterkin called ahead on the radio-telephone aboard the * * * Peterkin checking for westbound traffic in the area. He was an-

swered by the Tug Moir and thereupon advised the Moir that the Tug George Peterkin was towing five barges astern, and was approximately one-half mile west of the said bridges. The pilot of the Tug Moir advised him that he would await his passage east of the said bridge. Relying upon this, the Tug George Peterkin and her tow entered the draw works of the said bridges, proceeding down the middle of the channel. As the last barge in the tow of the Tug George Peterkin was clearing the said railroad bridge, the pilot of the Tug George Peterkin observed the Tug Moir and tow at the point of the aforedescribed bend located immediately east of the said bridges, and at a distance of approximately 1,000 feet.

"The pilot of the Tug George Peterkin, upon observing the Tug Moir immediately reduced speed and sounded one whistle which was answered by one whistle from the Tug Moir.

"At the time the Tug Moir was first sighted, she had not stopped to await the passage of the Tug George Peterkin, but still had headway on and was approaching the Tug George Peterkin and tow in violation of her agreement to await the said vessel's passage. * * *

"When the Barge M.V. 717 was approximately even with the bow of the lead barge of the tow of the Tug Moir, the lead barge in the tow of the Tug Moir, H.T.C.O. No. 45 collided with the portside of the Barge M.V. 717 approximately admidship of the said barge, causing extensive damage to Barge M.V. 717."

coastal Waterways with a hawser tow of five barges, the total length of the flotilla being 1,111 feet. A 15 mile per hour wind was blowing from the southwest, and a current of approximately 3 miles per hour was flowing from east to west. When about one-half mile west of Mud Bayou Railroad Bridge, the pilot of the Peterkin called on his radio to ascertain what shipping was east of him before he would undertake to pass under the railroad bridge and the adjacent highway bridge and traverse the rather sharp northward bend lying just east of those structures.

The only response he got was from the Tug Moir, which was at Mile Post 315.[3] Appellant's brief states: "As a result of this radio conversation with the Tug Moir,[4] it was agreed between the pilots of the two tows that the Tug Moir would wait for the Peterkin to come through the bridge." At the time the agreement was made the two tugs were slightly more than five miles apart. The parties agree in their briefs that, as found by the trial court, the point of collision was approximately opposite Mile Post 319.

The Peterkin, with its loose-jointed tow, kept to the center of the channel, which was about 125 feet wide, so as to avoid collision with the supports of the two bridges whose span was about 100 feet. When her pilot had seen the last barge through the abutments of the two bridges and was able to give his entire attention to what lay ahead, he discovered the Moir and her tow moving along the north bank of the waterway. There was a bend in the canal for the entire distance between the two tugs, which reached its sharpest point approximately at Mile Post 319, where the collision occurred. As the Peterkin approached around the bend, the leading barge of the Moir tow sheered off the north bank of the canal, and the pilot of the Moir put the tug under a double hook-up astern in an effort to break the sheer. This maneuver caused the stern of the single-screw tug to move out into the canal. In an effort to minimize the gravity of the collision—which to the pilot of the Peterkin seemed inevitable—as much as possible, the pilot tripped the Peterkin around her tow and began to break its headway. The result was that Moir's lead barge collided with M/V 717, middle barge of the Peterkin tow, causing the damage here sued on.

The Peterkin had moved approximately one mile after obtaining assurance from the Moir that she would await Peterkin's maneuver in passing the bridge abutments and turning the sharp bend, which was a move necessarily involved. The Moir had moved four miles during the interval, all along a straight reach of the canal, and had reached and rounded the point of the bend.

Under the language of appellant's brief and all of the proof, it had been agreed

3. A pleading of Higman, predecessor of Slade, states:

"At approximately 3:25 P.M. * * * the said Tug Moir and tow had arrived at Mile Post Marker 315 * * * and upon having arrived at the 315 Mile Post Marker at the above time, the pilot of the Tug Moir held a radio conversation with the pilot of the Tug George Peterkin. The pilot of the latter tug advised the pilot of the Tug Moir that he had a tow of five barges which were being towed astern of the said Tug George Peterkin and that the said tug and tow were east bound in the Intracoastal Canal and were, at that time, at a point approximately one-quarter mile west of the High Island Bridge. The pilot of the Tug George Peterkin further advised the pilot of the Tug Moir that he intended to pass through the' High Island Bridge and pass the Tug Moir and tow port to port.

"The pilot of the Tug Moir agreed to such a port to port passing * * *."

4. Appellant's brief describes the Moir and its tow in these words:

"The two barges being pushed by the Tug Moir were each 225 feet long, and the tug herself was 68 feet long, so that the total length of her tow was 518 feet. The entire tow was made up stiff and tight and three sets of push cables ran from the tug to the stern after bitts of the barge to which the tug was made up, so that there was no play between the barges or between the tug and her tow."

that the Moir would *wait* for the Peterkin. She did not wait, but moved four miles while the Peterkin was moving one. Instead of holding back along the straight course of the canal where she was in a safe position, the Moir had taken a position in the sharp bend, which the court below evidently concluded was the point of greatest danger. The court manifestly concluded that the Moir, with its lighter and more maneuverable tow, ought, in the exercise of reasonable care, to have waited at a point where the canal was straight, advised as she was of the difficult maneuvering which the Peterkin had to accomplish in avoiding the bridge abutments and negotiating the sharp bend. We think its findings were amply supported by the evidence.

The appellant, though admitting that the pilot of the Moir had agreed to wait while the Peterkin brought its unmaneuverable tow through the bridge and around the sharp bend, takes the position that the Peterkin had no right to rely on the agreement.[5] No convincing authority is cited for such a contention; and cf. J. S. Gissel & Co., et al. v. Dixie Carriers, Inc. et al., 5 Cir., 1955, 219 F.2d 233, affirming the District Court's decision, 117 F.Supp. 612. Under the facts before the court below, it was justified in finding that the Moir was required to exercise ordinary care in selecting a spot for the meeting which would afford reasonable protection to the two tows. With full knowledge of the problems with which the Peterkin was dealing and of the character of its tow, the Moir selected a point of meeting which made it inevitable that the resulting collision would ensue.

Finding no reversible error in the interlocutory order of the trial court, it is affirmed and the cause is remanded for other proceedings consistent with this opinion.

*Affirmed and remanded.*

5. Appellant's brief thus expresses the contention:
   "Thus, neither the Peterkin nor the District Court may rely on a passing agreement reached by radio where, as here, the Pilot of the Peterkin has no definite agreement as to where the Moir would wait for him on the east side of the bridge."