Irvin SAVOIE and National Marine Service, Inc.,

v.

APACHE TOWING CO., Inc.

Irvin SAVOIE

v.

NATIONAL MARINE SERVICE, INC.

No. 7949, Civ. A. No. 67-38.

United States District Court
E. D. Louisiana,
New Orleans Division.

March 29, 1968.

Alfred M. Farrell, Jr., of Terriberry, Rault, Carroll, Yancey & Farrell, Harry S. Redmon, Jr., Trial Atty., Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for National Marine Service, Inc.

Stanley L. Perry, Perry & Perry, Galliano, La., for plaintiff.

MITCHELL, District Judge.

### FINDINGS OF FACT

1. These consolidated actions arose from a collision on December 17, 1964 between the tow of the M/V *Apache* and the stern of the M/V *Midwest Cities* resulting in damages to *Midwest Cities* and injury to Irvin Savoie, one of her deckhands. Savoie brought the first action (No. 7949) against Apache Towing Co., Inc., owner of *Apache*. National Marine Service, Inc., as owner of *Midwest Cities*, intervened therein for its damages, including maintenance and cure payments to Savoie. Savoie then filed a Jones Act suit (No. 67–38) against National Marine Service, Inc.

Savoie reached amicable settlement with Apache Towing Co., Inc., which advanced funds non-prejudicially against a release to both vessels. Liability for all of the losses remains for adjudication.

2. At the time in question, *Midwest Cities* was upbound Bayou Chene, a relatively narrow, winding stream, which runs generally north until it intersects with the Intracoastal Waterway. *Midwest Cities* is a standard type canal pushboat, pilothouse controlled to a single screw with an 800 horsepower General Motors diesel engine, 84 feet in length by 24 feet in beam, with a draft of 6 feet at the bow and 7 feet at the stern. Her tow, in an integrated tandem ahead, consisted of the loaded oil barges *LTC 56* and *LTC 57*. The flotilla had an overall length of 684 feet, loaded to an even draft of 9 feet 6 inches, and it made 5 MPH at full speed.

3. Either around midnight or during the early morning hours of December 17, *Midwest Cities* passed *Apache* while the latter was making up her pushtow of five empty barges preparatory to proceeding up Bayou Chene astern of the *Midwest Cities*. *Apache's* tow was strung out in single tandem 680 feet in length overall plus 60 feet for *Apache*. The *MMS–154*, lead barge in *Apache's* tow, had a mobile crane (with boom) sitting on tracks on her deck, with a raised operator's house projecting some 14 feet above the deck of the barge. After *Apache* got underway with her tow she immediately began gaining on *Midwest Cities* due to her greater speed.

4. In one or more radiophone exchanges between the vessels' respective masters, which occurred about the time *Midwest Cities* was running two sharp bends of the bayou so that her lights, visible astern, were temporarily out of view of *Apache's* master, it was agreed that after *Midwest Cities* negotiated her tow around the turn (to her right or star-

board hand) exiting from Bayou Chene into the Intracoastal Waterway, she would slow down in the straightaway (at about Mile Post 85) and let the faster *Apache* overtake and pass her.

After negotiating the second bend, *Midwest Cities* ran a straight reach of the bayou for almost half a mile. As the head of her tow approached a sharp right hand turn at the confluence of Bayou Chene and the Intracoastal Waterway, the loaded lead barge rubbed the sloping right hand bank and became temporarily stranded in the mud bank. *Midwest Cities*, with her propeller still running full ahead and water under her 7 foot astern draft, lay about 40 feet off her right hand bank and at a slight angle into the 150 foot wide channel. She continued to display all of her underway lights, as it was expected that the barges would momentarily break free and the flotilla accelerate to full speed.

5. Meanwhile, *Apache*, which was about one half mile astern of *Midwest Cities*, shaped her long tow around the last bend. She had no lookout on her bow and blew no bend signal. *Midwest Cities'* radar, on the half mile range, disclosed to her master the bow of *Apache's* tow coming around the pronounced bend astern. *Apache's* tow appeared to flank to port, i. e., the west bank, and thereafter straighten out to starboard, with her lead barge headed for the stern of *Midwest Cities*. The latter's master testified that he called *Apache* on the radiophone and informed her that "you are going to run over me". On receiving no reply, he sounded four rapid blasts of the whistle as a danger signal, heard no reply thereto, and thereafter twice repeated the danger signal.

6. When *Apache* rounded the bend and was herself in the straightaway, her master canted the head of her tow to port in order to be able to see around

the dragline on her lead barge. He saw *Midwest Cities* ahead, showing deck and amber towing lights, and reduced *Apache's* speed to about 4 MPH. However, *Apache's* lead barge was bearing down on the stern of *Midwest Cities* and her master testified, "I didn't realize I was overtaking him that fast." He further testified that he heard *Midwest Cities* sound two separate sets of danger signals, that he replied with a danger signal, reversed *Apache's* engine, and made no change of rudder. *Apache's* headway, though her engines had just been reversed, caused her lead barge to strike and climb over *Midwest Cities'* stern and crash on into her pilothouse, causing damage to her and injury to Savoie.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter and the venue is proper.[1]

2. *Apache* was at fault for her failure to have a lookout stationed at the head of her tow, some 680 feet ahead of her bow. Although the nighttime visibility was good and clear, in the circumstances here, a lookout at the head of her tow, when it came around the blind bend, would have seen the lights of *Midwest Cities* much sooner than *Apache's* pilot, and in time to warn the latter. The absence of a lookout is also pertinent because of the dragline on the deck of the lead barge, with its boom and operators cab almost 20 feet above the water line, and which at times might have partially obstructed the view from *Apache's* pilothouse.[2]

3. *Apache* was at fault in failing to sound the statutorily required blind bend signal,[3] and she is unable to show that the violation "could not have been" a contributing cause.[4]

---

1. 28 U.S.C. § 1333.

2. Inland Rules, (Art. 29); 33 U.S.C. § 221.

3. Inland Rules, (Art. 18, Rule V); 33 U.S.C. § 203.

4. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148; J. S. Gissel & Co. v. Dixie Carriers, Inc. (The San Jacinto, The Ben B), 117 F.Supp. 612 (ED La.), aff'd 219 F.2d 233 (CA 5).

4. If *Apache* intended to overtake *Midwest Cities*, she failed to stand clear of the vessel being overtaken, failed to obtain the permissive signal to overtake, and then ran down the overtaken vessel from astern.[5]

5. The testimony of the master of *Apache* is to the effect that when his flotilla was in the straight reach of Bayou Chene he had in view the deck and amber towing lights on the stern of *Midwest Cities*, at a distance of a third of a mile ahead, but did not realize that he was overtaking so fast. Accordingly, *Apache* was at fault for failing to slow sufficiently, or back down on her engines timely, in order to avoid a collision.

6. *Apache's* contention that she was entrapped because of *Midwest Cities'* lights is without merit. She contends that *Midwest Cities* was not a vessel "underway" within the meaning of the rules and, therefore, the latter should have extinguished all of her underway lights and displayed her anchor light only. Such an anchor light would have been a single white light, showing all around the horizon, on the top of the mast of *Midwest Cities*.[6]

Although this same topmast 32-point light was in fact being displayed by *Midwest Cities* in conjunction with her amber towing lights, screened to be visible astern, *Apache's* master repeatedly admitted that he at no time could recall seeing the white all around light. He recalled seeing only the towing lights, as well as deck lights below. Even if it were a fault to show the towing light, what lights would he have seen? What difference would it have made? Lights for running and anchoring are very similar except for red and green side lights on the latter—and if coming up astern more than two points (11¼ degrees per point) abaft the beam, he could not see the side

lights. All he would have seen were white lights anyway.

Further, *Midwest Cities* herself was never aground: her headway had been halted by her lead barge being wedged in the mud bank; her engines continued to run full ahead during the 5, 10 or even 15 minutes intervening between the going on the mud bank and the collision; and her tow might have broken free at any moment and accelerated to full speed. Accordingly, she was a vessel "underway" but with "no way on", and it was proper for her to continue to show her navigation lights, including those displayed to craft astern indicating that she had a tow ahead. Thus, in our opinion, the configuration of *Midwest Cities'* lights, the absence of a single white anchor light, and the presence of her running and towing lights, either played no part, or an infinitesimal one at most, in the collision for the reasons explained supra.[7]

7. *Apache* being at sole fault for the collision, National Marine Service, Inc., as owner of *Midwest Cities*, is entitled to a decree against Apache Towing Co., Inc. for its provable damages.

8. The remaining point to be decided, as stipulated by the parties, is whether the payments in maintenance and cure by National Marine Service, Inc. to Irvin Savoie, *Midwest Cities'* injured crewman, are recoverable as collision damages against *Apache* should she be found at fault. *Apache* contends that the maintenance and cure obligation of the owner arises contractually, and without fault, and that the payments to Savoie cannot be recovered against a third party except by contract, either implied or expressed.

*Midwest Cities* contends that although the payments are a contractual obligation, they would never have been incurred but for the tort and, having been so incurred, they are no different than any

5. In violation of Inland Rules (Art. 18, Rule VIII), 33 U.S.C. § 203, and (Art. 24), 33 U.S.C. § 209.

6. Inland Rules (Art. 11), 33 U.S.C. § 180.

7. Transfer No. 8, 1357, 25 F.2d 628, 629, (CA 2); General Seafoods Corp. v. J. S.

Packard Dredging Co. (Exeter–Trim), 120 F.2d 117, 120, (CA 4); Trinidad Corp. v. Indian Towing Co. (The Lyons Creek, Tug Comanche and Tow), 293 F.2d 107, 110 (CA 5).

other losses incurred by her owner, such as costs for her repair and her loss of earnings. She urges that the recoverability of any damages is tested only by proximate causation such as other contractual obligations to pay for pilotage, tugboats and wharfage during collision detention and, hence, all are recoverable in damages.

9. In Jones v. Waterman S.S. Corp.,[8] the Court declined to follow the earlier The Federal No. 2,[9] and allowed the shipowner/employer to recover from the tortfeasor what the employer had paid its seaman in maintenance and cure. Recovery of maintenance and cure from a third party has also been allowed in Rogers v. Stuyvesant Insurance Company of New York,[10] Sillanpa v. Cornell S.S. Co., et als.[11] and Valentine v. Wiggins.[12]

Although the Fifth Circuit has not been confronted with this issue, the shipowner's right to recovery over from a tortfeasor was impliedly recognized in Myles v. Quinn Menhaden Fisheries, Inc.[13]

■ 10. The Court finds that, under the principles of maritime law governing the recoverability of collision damages proximately caused by the offending vessel, it is logical and just that payments of maintenance and cure should follow the same rule of assessment of damages as does any of the other items of collision losses. In Halcyon Lines v. Haenn Ship, Ceiling, and Refitting Corp.,[14] the Supreme Court, while disallowing contribution between joint tortfeasors in a non-collision case, said quite clearly:

"Where two vessels collide due to the fault of both, it is established admiralty doctrine that mutual wrongdoers shall share equally the damages sustained by each, as well as personal injury and property damage inflicted on innocent third parties. This maritime rule is of ancient origin and has been applied in many cases, but this Court has never expressly applied it to non-collision cases."

There are many instances of collision damage constituting payments made by a vessel owner to a third party which merged with the former's physical losses in the ultimate recovery or set-off. When cargo recovers from the non-carrying vessel, the latter can recoup one-half of that payment from the carrier if the collision is one of mutual fault.[15]

"And it is established, as it logically follows, that the division of damages extends to what one of the parties pays to the owners of cargo onboard the other * * * the right to the division of the latter element does not stand on subrogation, but arises directly from the tort."[16]

Further, the rationale of the collision damage decision in Weyerhaeuser S.S. Co. v. United States[17] reinforces the conclusion that any proper expenditure by a vessel owner resulting from a collision forms part of the recoverable damages against the other vessel at fault.

■ 11. Apache Towing Co., Inc., as owner of M/V *Apache*, is liable to National Marine Service, Inc., as owner of M/V *Midwest Cities*, for all of the latter's damages resulting from the collision, including maintenance and cure payments to Savoie.

Let judgment in the amount of $16,180.32, with interest from the date of the occurrence, be entered accordingly.

8. 155 F.2d 992, (CA 3).

9. 21 F.2d 313, (CA 2).

10. 198 So.2d 685 (La.App.1967), cert. granted 202 So.2d 655.

11. 1954 AMC 1189 (S.Ct.N.Y.).

12. 242 F.Supp. 870 (ED NC–1965).

13. 302 F.2d 146, (CA 5).

14. 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318.

15. The Chattahoochee, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801 (1899).

16. Erie Railroad Co. v. Erie & Western Transportation Co., 204 U.S. 220, 226, 27 S.Ct. 246, 51 L.Ed. 450 (1907).

17. 372 U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1.