In the Matter of the Complaint of MAC TOWING INC., for Exoneration From or Limitation of Liability as Owner of the M/V Warren McKinney, Plaintiff-Appellant Cross-Appellee,

v.

AMERICAN COMMERCIAL LINES, Defendant-Appellee,

Alamo Chemical Transportation Co. and Marine Barge Lines, Inc., Defendants-Appellees Cross-Appellants.

No. 81–2166
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.

March 15, 1982.

---

Robert M. Julian, Houston, Tex., for plaintiff-appellant cross-appellee.

H. Lee Lewis, Jr., Charles W. Kelly, Houston, Tex., for American.

Joseph Newton, Houston, Tex., for Alamo and Marine Barge.

Before BROWN, POLITZ and WILLIAMS, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Once again, we are urged to second guess the factual findings of the trial court in an admiralty matter. This litigation arises out of a collision between two tows in the Gulf Intracoastal Waterway at its intersection with Galveston Bay. Mac Towing, which seeks exoneration from or limitation of liability, asserts that the trial judge erred in his factual determinations and in his equal apportionment of damages between the two tows. Applying the now familiar "clearly erroneous" test to the trial court's factual findings, we affirm.

## I.  FACTS

Early on the morning of June 13, 1979, the M/V WARREN McKINNEY, owned by Mac Towing, Inc., was proceeding eastbound in the Gulf Intracoastal Waterway (GICW) from Corpus Christi, Texas to New Orleans, Louisiana. A twin screw towboat, 57 feet long, powered by two 400-horsepower diesel engines, WARREN McKINNEY was pushing four barges owned by American Commercial Lines (ACL). The flotilla thus constituted stretched approximately

800 feet in length. The barges, each 195 feet by 35 feet, carried cargoes of aluminite. At the conn was relief captain Donald Higgerson.

Proceeding westbound in the GICW was the M/V PHILLIP ARTHUR, a 70-foot tow boasting two diesel engines with 450 horsepower each, owned by Alamo Chemical Transportation Co. It was pushing two unmanned barges, owned by Marine Barge Lines, Inc., with a cargo of naptha. Its pilot was John King. PHILLIP ARTHUR approached Galveston Bay in that part of the GICW dredged through Bolivar Peninsula sometimes labeled Bolivar Cut. It intended to cross the mouth of Galveston Bay and then turn northward in the Houston Ship Channel.

WARREN McKINNEY, nearing the cut in Pelican Island, also was preparing to cross Galveston Bay and continue along the GICW.

A strong southerly ebb tide through the narrow opening between Pelican Island and Bolivar Cut, the spot where water running out of Galveston Trinity and East Bays converges, produced a strong tidal current. To traverse this channel, a vessel not only must fight the tide but must also beware of heavy traffic proceeding along the Houston Ship Channel.

The night of June 12 and the early morning of June 13 were clear, and the visibility was good. Before leaving Pelican Island, Higgerson, on WARREN McKINNEY, contacted the United States Coast Guard Galveston-Houston Vessel Traffic Center (VTC) to ascertain the traffic in the vicinity. VTC informed him that two ocean-going ships were inbound in Bolivar Roads and that NATIONAL GOAL, a tow with one barge, was southbound in the Ship Channel, intending to turn eastbound in the GICW. WARREN McKINNEY waited until the ships passed, then sallied forth.

As WARREN McKINNEY crossed the Bay, Higgerson, its pilot, spoke by radio with the captain of NATIONAL GOAL,

William Zorn.[1] In their exchange, Zorn commented that the current was "running like a scalded ape" in the Bay. As WARREN McKINNEY moved beyond Texas City Channel toward the Houston Ship Channel, VTC informed PHILLIP ARTHUR of WARREN McKINNEY's course. The vessels made contact by radio when they were 2.95 statute miles apart. Captain Higgerson said that because of the current WARREN McKINNEY would be crossways to the channel in the GICW, at about 45°, but pledged to go as quickly as possible. PHILLIP ARTHUR promised to hold up in the GICW until WARREN McKINNEY cleared the Bay. Then they would make a one-whistle (port-to-port) pass. Another westbound vessel, DIXIE VOLUNTEER also agreed to back down.

Because of a strong westerly current in the GICW, PHILLIP ARTHUR drifted more quickly than its captain anticipated. Six minutes before the accident, NATIONAL GOAL cautioned PHILLIP ARTHUR of WARREN McKINNEY's difficulties and warned it to hold up until the tow was safely through. Acknowledging the problem, PHILLIP ARTHUR said it was sliding down a bit, slowly, but could hold. Four minutes before the collision WARREN McKINNEY again warned of its crossways approach. PHILLIP ARTHUR responded, saying it was drifting but had "enough wash to kind of hold it." About a minute later, PHILLIP ARTHUR for the first time said that it could not hold back and announced its intention to "drive out" of the channel. The tows would likely meet just outside the end of the north jetty at Bolivar Cut. At that time Higgerson told King to come out quickly if he had to. PHILLIP ARTHUR went to full speed and tried to get between the head of WARREN McKINNEY's tow and Bouy 20, near the Bolivar north jetty. Never reducing its speed, WARREN McKINNEY proceeded ahead until King advised Higgerson that he would not make it, about a minute before impact. Higgerson backed down, but it was too late. At 1:25 a.m., the port for-

1. The Coast Guard tape recorded all bridge to bridge radio communications on Channel 13, and the transcripts were admitted into evidence.

ward quarter of WARREN McKINNEY's lead barge, ACBL 2898, was still north of the center line of the channel when it collided with and holed the port side of PHILLIP ARTHUR's barge the Alamo 8. The naptha ignited and created a fire that caused damage of $900,000 to PHILLIP ARTHUR, of $15,000 to ACBL 2898, and of $24,994.50 to LaJet, Inc., which owned the naptha cargo. The crew escaped without injuries.

## II. PROCEDURAL HISTORY

Mac Towing petitioned for exoneration from or limitation of liability, 46 U.S.C. § 183; Rule F, Supplemental Rules for Certain Admiralty and Maritime Claims, F.R. Civ.P.; and 28 U.S.C. § 1333(1), and posted an ad interim stipulation in the amount of $258,000. Responding to the published Monition, Alamo, Marine Barge, ACL, and LaJet filed claims and answers contesting Mac Towing's right to either exoneration or limitation. ACL and LaJet also filed cross-claims against Alamo.

The Court tried the cause without a jury and, upon the parties' motion, bifurcated the issues of liability and damages. In its Findings of Fact and Conclusions of Law, the Court found both vessels equally at fault in causing the collision and granted Mac Towing's petition to limit liability to the value of WARREN McKINNEY and her pending freight. After dismissing LaJet's claim pursuant to an agreement among the parties, the Court entered an interlocutory order granting ACL recovery jointly and severally from Mac Towing and Alamo, granting Marine Barge recovery from Mac Towing, and granting Alamo recovery of one-half of its damages from Mac Towing, all subject to the limitation of liability.

## III. ISSUES ON APPEAL

The parties raise a number of issues on appeal. Mac Towing challenges many if not most of the trial court's factual findings and argues that the court incorrectly allocated damages. Alamo, happy with the factual findings, merely contests the limitation of liability.

■ We begin with the familiar concept that we must uphold on appeal the trial court's findings of fact unless they are "clearly erroneous", F.R.Civ.P. 52; *McAllister v. United States*, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed.2d 20, 24 (1954), a concept that "like some marine life, is now encrusted on the admiralty." *Ellis Towing & Transportation Co. v. Socony Mobil Oil Co.*, 292 F.2d 91, 93 (5th Cir. 1961); *see also Allied Chemical Corporation v. Hess Tankship Co. of Delaware*, 661 F.2d 1044 (5th Cir. 1981); *Tittle v. Aldacosta*, 544 F.2d 752 (5th Cir. 1977); *Davis v. Parkhill-Goodloe*, 302 F.2d 489 (5th Cir. 1962). Judge Bue, who heard the witnesses and saw all of the exhibits, was in the best position to judge credibility. His logical and sensible findings are well above the Plimsoll line of Rule 52, and so we reject Mac Towing's challenges.

### A. *Navigational Faults*

■ Mac Towing argues that PHILLIP ARTHUR's violation of navigational rules constituted the sole cause of the collision. First, it attacks PHILLIP ARTHUR's failure to live up to the agreement to hold back. A local custom such as an agreement to hold back may carry the force of law, and a vessel that breaches that agreement must shoulder the consequences. In *Union Oil Co. of California v. Tug MARY MALLOY*, 414 F.2d 669 (5th Cir. 1960), this Court upheld a local custom that required tugs to hold up to allow tankers to enter the Sabine-Neches Canal. *See generally* C. Black & G. Gilmore, *The Law of Admiralty* § 7–13, at 515 (2d ed. 1975). The District Court found that PHILLIP ARTHUR broke its agreement to hold up, and did impose liability on that basis. Yet it also found fault on the part of WARREN McKINNEY, for its continuing in its course until too late to take evasive action to avoid collision. We cannot term its decision that both vessels were at fault "clearly erroneous" in those circumstances.

■ Mac Towing correctly observes that PHILLIP ARTHUR's captain was responsi-

ble for ascertaining the current and understanding its effect on his ship. The venerable *Davidson Steamship Co. v. United States*, 205 U.S. 187, 27 S.Ct. 480, 51 L.Ed. 764 (1907), *quoting Atlee v. Northwestern Union Packet Co.*, 21 Wall. 389, 396, 22 L.Ed. 619, 621 (1875), held a pilot liable for failure to keep abreast of harbor improvements and, in general, carefully to observe the effects of the current. *See also Utility Service Corp. v. Hillman Transportation Co.*, 244 F.2d 121 (3d Cir. 1957). With similar reasoning, Mac Towing lays the blame for the accident at the feet of Captain King, whose misapprehension of the speed of the current led PHILLIP ARTHUR out of the GICW before WARREN McKINNEY arrived. Once again, the District Court made such a finding but concluded that the tug was not solely at fault. We agree.

*Slade, Inc. v. Mississippi Valley Barge Line Co.*, 296 F.2d 188 (5th Cir. 1961), involved a collision in the GICW after one vessel breached its agreement to hold up to allow another to pass safely beneath a dangerous railroad bridge. The Court imposed full liability on the breaching vessel. While *Slade* offers some comfort to Mac Towing, the fault there—where the tug MOIR moved some four miles after the agreement to hold up, while PETERKIN moved only one mile—so far outweighs the fault here that it does not avail Mac Towing.

■ Mac Towing also argues that once PHILLIP ARTHUR, with little room to spare, announced its intention to "drive out" of the GICW, WARREN McKINNEY was *in extremis* and its actions should be judged accordingly. *Afran Transport Co. v. S/S TRANSCOLORADO*, 458 F.2d 164 (5th Cir. 1972), *citing Union Oil, supra*, discusses the theory of sudden peril that permits a vessel to escape strict application of the navigational rules. *See also Ellis Towing, supra.* Here, however, the District Court found that WARREN McKINNEY had ample warning of PHILLIP ARTHUR's inability to hold up, so that only its failure to change course or slow down until the last minute placed it in peril. That finding,

which we approve, pretermits Mac Towing's *in extremis* argument.

■ Finally, Mac Towing pleads that the Coast Guard accident report that attributed the blame to PHILLIP ARTHUR deserved the District Court's attention. The District Judge properly admitted the report into evidence, *see Afran Transport, supra* at 171, but he was entitled to give the report whatever deference he felt it deserved. Since the Coast Guard report is merely advisory, he acted within his discretion and committed no error in failing to bow to its conclusions.

### B. *Proportionate Fault*

■ Mac Towing implies that the District Court, by assessing damages at 50% to each side, ignored *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251, 1975 A.M.C. 541 (1975). That case altered the time-honored 50/50 rule, that if both vessels contributed to an accident, no matter how much greater one's fault might be, each bore the burden in equal shares. *See generally Allied Chemical, supra* at 1057. That a court divided damages equally among the parties does not mark a failure to follow *Reliable Transfer*. If the court finds the parties equally at fault, so be it. In establishing comparative negligence in admiralty, the Supreme Court certainly did not delete the number "50" from the federal courts' vocabulary.

We have held that the "clearly erroneous" standard governs a trial court's allocation of damages among vessels. *Allied Chemical, supra; Termar Navigation Co. v. S.S. POLANICA*, 529 F.2d 1166, 1976 A.M.C. 590 (5th Cir.), *cert. denied*, 429 U.S. 862, 97 S.Ct. 165, 50 L.Ed.2d 140 (1976). Even if we might select some other figure, the trial judge's decision is far from "clearly erroneous", and so we affirm his choice.

### C. *Limitation of Liability*

■ PHILLIP ARTHUR, anxious to have its turn in the appellate limelight, finds fault with the trial court's conclusion that Mac Towing may limit its liability. A shipowner's right to limit his liability de-

pends on his lack of "privity or knowledge" of the cause of the loss. 46 U.S.C. § 183.[2] "What is meant by privity or knowledge is not easy to pin down," *Gibboney, as owner of LOVE MACHINE v. Wright,* 517 F.2d 1054, 1057 (5th Cir. 1975). Alamo argues that Captain Higgerson was ignorant of the most basic facts of navigation and speculates that perhaps he lacked a chart of the area. Such defects allegedly rendered WARREN McKINNEY unseaworthy. This point the trial judge rejected in his findings of fact. The record sustains his decision. It demonstrates that Higgerson was a qualified pilot with long experience piloting similar tugs in that area. We agree with the District Court that his deficiencies did not rise to the level of unseaworthiness and thus does not constitute "privity or knowledge". Ordinarily "errors in navigation or other negligence by master or crew are not attributable to [the shipowner] for limitation purposes." *Tittle v. Aldacosta, supra* at 756.

It follows that the District Court correctly allowed Mac Towing to limit its liability in this proceeding.

The District Court decision is in all respects correct.

AFFIRMED.

**2.** Amount of liability; loss of life or bodily injury; privity imputed to owner; "seagoing vessel"

(a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.