**WARRIOR & GULF NAVIGATION COMPANY, Libelant,**

*v.*

**The S.S. STEEL VOYAGER, her engines, tackle, apparel and furniture, and Isthmian Lines, Inc., Respondent.**

**No. 3974.**

United States District Court
E. D. Louisiana,
New Orleans Division.

Dec. 30, 1964.

Lemle & Kelleher, George B. Matthews, New Orleans, La., Alton D. Fulmer, for libelant.

Phelps, Dunbar, Marks, Claverie & Sims, George W. Healy, III, James H. Roussel, New Orleans, La., for Isthmian Lines, Inc.

L. Howard McCurdy, Jr., Asst. U. S. Atty., for the United States.

AINSWORTH, District Judge:

This libel involves a collision in the Mississippi River at New Orleans on an early foggy morning between an ocean freighter and a river pushboat with tow. At approximately 4:15 a. m. on May 1, 1959, a collision occurred between the tow of the M/V HUGH PARKER and the SS STEEL VOYAGER near the west bank of the Mississippi River in the vicinity of a mooring facility known as Ralph's Fleet in the New Orleans harbor. As a result of the collision, the Barge WGN–81 and her cargo of steel were sunk and the Barge WGN–85 and the SS STEEL VOYAGER sustained certain hull damage. Warrior & Gulf Navigation Company, as owner of the two barges and as bailee of the cargo laden in the Barge WGN–81, libeled the STEEL VOYAGER and its owner, Isthmian Lines, Inc. Isthmian denied liability and filed a cross-libel against Warrior & Gulf Navigation Company. The United States of America, as owner of certain cargo laden in the STEEL VOYAGER, filed an intervening libel to recover its general average expenses.

The M/V HUGH PARKER is a river-type pushboat measuring approximately 135 feet in length by 24 feet in breadth. It is powered by two 900-horsepower engines, pilothouse controlled and equipped with backing and flanking rudders. Her crew consisted of fifteen men. The Barges WGN–81 and WGN–85 are steel open hopper barges, each measuring 26 feet in breadth and 175 feet in length. The SS STEEL VOYAGER is a large ocean-going vessel designed for the carriage of general cargo and measures approximately 500 feet in length.

On the morning involved, the M/V HUGH PARKER with four WGN barges in tow arrived at Ralph's Fleet and picked up two additional barges. The tow was then made up in two strings of three barges each. The WGN–81 was the lead barge in the starboard string and the WGN–85 was the lead barge in the port string. After the tow was made up, the HUGH PARKER cast off its lines, but before getting under way its master noticed a heavy fog moving downriver and decided to wait for better weather. He felt that it would be unsafe to tie off at the lower end of the fleet because of the fact that an eddy located there might cause the HUGH PARKER and its tow to move in and out against the moored barges in the fleet. Accordingly, he instructed his pilot to move to the upper end of Ralph's Fleet and tie off so that

the entire length of the tow could lie against the moored barges. The engines of the HUGH PARKER were placed ahead, and the boat and her tow moved to the upper end of the fleet. Several fog signals were blown by the HUGH PARKER. The master and the pilot heard one or two fog signals blown by a vessel at a point upriver from Ralph's Fleet. They also saw a "pip" on the radar scope indicating that there was a vessel upriver. However, the "pip" disappeared when the vessel apparently blended with the west bank. On reaching the upper end of the fleet, the headway of the tow was stopped completely and the engines of the towboat were placed at slow ahead to compensate for a 3-mile current in the river. During this maneuver the deckhands were out on the barges preparing to tie off, when suddenly the SS STEEL VOYAGER, proceeding downriver, loomed into sight out of the fog, close to the west bank almost directly ahead or slightly off the port bow of the tow, proceeding at approximately 5 to 8 miles per hour. The HUGH PARKER blew a danger signal and placed both of her engines full astern, but before the engines responded, the stem of the STEEL VOYAGER struck the Barge WGN–81, sank it, and damaged the Barge WGN–85.

The STEEL VOYAGER had left her berth in the New Orleans harbor on the east descending bank of the river at approximately 3:53 a. m., being navigated, partially by radar, by a State pilot. Her master and two officers were on watch on the bridge and the chief officer and two crew members were at the bow. Assisted by a tug, she left the dock, turned around and headed downriver to sea at a speed of 8 to 11 knots. Her engines were half speed ahead. Visibility was restricted due to a heavy fog.[1] After the STEEL VOYAGER completed the turn, the assisting tug cast off its lines. The pilot was moving back and forth from the radar scope in the wheelhouse to the wings of the bridge. He interpreted the radar scope to indicate that the vessel was approximately in the middle of the river; actually it was close to the right descending bank and barely avoided colliding with another vessel moored 10 to 15 feet away and observed by the men on watch. Immediately the pilot ordered a left helm, which order was countermanded by the STEEL VOYAGER'S master, and the rudder of the vessel remained amidships, causing the vessel to continue further into the bend of the river. General confusion and excitement aboard the STEEL VOYAGER followed. Before the confusion abated and when the STEEL VOYAGER was approximately 450 feet from Ralph's Fleet the HUGH PARKER and her tow were sighted. Almost immediately the vessels collided.

At the time of the collision the HUGH PARKER and its tow were stopped in the river with reference to Ralph's Fleet, having no forward movement over the ground. The tow was almost parallel to Ralph's Fleet and approximately 20 feet out in the river from the outboard side of the fleet. On the head of the tow there were red, green and amber lights. The HUGH PARKER was showing red and green lights as well as towing lights on her aftermast.

Respondent Isthmian Lines, owner of the STEEL VOYAGER, has admitted in its supplemental answer that the immoderate speed of the vessel proceeding in the fog was a proximate cause of the collision, but maintains in its brief that the HUGH PARKER was under way[2] at the time of the collision and accordingly she was bound to adhere to the rules governing a vessel under way in fog;[3] that the HUGH PARKER violated these rules, and being guilty of statutory faults it was incumbent upon

---

1. The testimony is overwhelming that there was a dense fog. Captain Sheffield of the STEEL VOYAGER did not see the lights on the barges until "just befor [they] hit."

2. "A vessel is 'under way', within the meaning of these rules, when she is not at anchor, or made fast to the shore, or aground." 33 U.S.C. § 155.

3. 33 U.S.C. §§ 191, 192, 221.

libelant to prove that these faults did not contribute to the collision, failing in which the HUGH PARKER is bound to divide damages.[4] The alleged faults of the HUGH PARKER are excessive speed under the circumstances; failure to have a proper lookout; failure to take appropriate action upon hearing fog signals forward of her beam; and failure to sound proper fog signals. These charges are not supported by the evidence. Whether or not the HUGH PARKER was technically under way is, therefore, immaterial. All of the necessary precautions had been taken by libelant. Prior to and at the time of the collision her engines were at "slow ahead" to compensate for a 3-mile current in the river, resulting in no movement over the ground, her lights were showing and fog signals had been blown. Because of the excessive speed of the STEEL VOYAGER and the limited visibility, there was nothing that the HUGH PARKER could have done to avert the catastrophe. Furthermore, even if the HUGH PARKER could be said to have violated any navigational rules—and the evidence is to the contrary—the faults were negligible compared to those of the STEEL VOYAGER. As stated in Compania De Maderas, Etc. v. The Queenston Heights,[5] "We are in accord with the statement of the First Circuit, in Seaboard Tug & Barge v. Rederi AB/Disa, 213 F.2d 772, that the Supreme Court, in The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148, did not intend to establish a hard and fast rule that every vessel guilty of a statutory fault has the burden of establishing that its fault could not by any stretch of the imagination have had any causal relation to the collision, no matter how speculative, improbable, or remote."

We find that gross negligence on the part of the STEEL VOYAGER in proceeding at excessive speed through heavy fog, in navigating too close to the west bank of the Mississippi River and in running into libelant's tow which was making no headway at the time and was in the process of mooring to Ralph's Fleet, when there was ample space in the river for the STEEL VOYAGER to maneuver, was the sole cause of the collision and the resultant damage. Compania De Maderas v. The Queenston Heights, supra; Avondale Marine Ways, Inc. v. The Crescent Cities, E.D.La.1960, 184 F.Supp. 773.

At the trial the court reserved ruling on the objection of Isthmian Lines to the offer by libelant of testimony of the deceased pilot of the STEEL VOYAGER before the United States Coast Guard at its hearing following this collision as an adverse witness. The court now concludes that the offer was proper and the testimony is received in evidence. The Dixie Sword, D.C.N.Y.1944, 57 F. Supp. 183.

Decree in favor of libelant Warrior & Gulf; cross-libel of Isthmian is dismissed; intervention of the United States of America is likewise dismissed.

---

4. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148 (1874).

